## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ISG INTERNATIONAL, INC.,<br>   a Maryland corporation,<br>   204 Cedar Street,<br>   P.O. Box 716,<br>   Cambridge, Maryland 21613,<br><br>         Plaintiff,<br><br>         v.<br><br>NATIONAL ASSOCIATION OF COMPUTER<br>CONSULTANT BUSINESSES, INC.,<br>   a District of Columbia non-profit corporation,<br>   1420 King Street, Suite 610,<br>   Alexandria, Virginia 22314,<br><br>         Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)   Judge:<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff ISG International, Inc., formerly known as G. Philip Feldman, Inc. ("ISG"), alleges for its Complaint for declaratory relief against the National Association of Computer Consultant Businesses, Inc. (the "NACCB") as follows:

1.     This is a civil action for declaratory relief of contract and trademark rights arising from an exclusive royalty-bearing license agreement between ISG and the NACCB made as of January 1, 1994 ("the 1994 License Agreement"). Pursuant to the 1994 License Agreement, NACCB granted ISG an exclusive license to use the names "National Association of Computer Consultant Businesses" and "NACCB" (together, "the Licensed Names") in connection with ISG's marketing and sale of a property and casualty insurance program to NACCB's Members (defined as those Information Technology services companies represented by NAACB) and similar companies whose names appear on Licensor's mailing list, but are not members ("Potential Members"), in

- 1 -

exchange for the payment of specified royalties to NACCB.  ISG respectfully seeks and is entitled

to judicial declarations regarding its license rights and royalty obligations under the 1994 License

Agreement and that it has not violated NACCB's intellectual property rights.

## PARTIES

2.      Plaintiff ISG is a corporation organized and existing under the laws of the State of

Maryland, having its principal place of business at 204 Cedar Street, Cambridge, Maryland 21613.

ISG is a citizen of the State of Maryland.

3.      Defendant NACCB is a non-profit corporation organized and existing under the

laws of the District of Columbia, and upon information and belief, has its principal place of business

at 1420 King Street, Alexandria, Virginia 22314.

## JURISDICTION

4.      This Court is authorized to award declaratory relief pursuant to the Declaratory

Judgment Act, 28 U.S.C. §§ 2201-02.

5.      This action arises under the trademark laws of the United States, in that it is a claim

for a judicial determination that ISG has not impermissibly infringed any rights NACCB may have

in the Licensed Names under the Federal Trademark Act, 15 U.S.C. §§ 1051 *et seq.* ("the Federal

Trademark Act").  Thus, this Court has subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1331.

6.      This Court is authorized to exercise supplemental jurisdiction over pendent state-law

claims pursuant to 28 U.S.C. § 1367.

7.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1332, because there is complete diversity between the parties and the amount in controversy

exceeds the sum or value of $75,000, excluding interests and costs.

8.    This Court has personal jurisdiction over NACCB because NACCB, among other things:

(a)    is a corporation organized and existing under the laws of the District of Columbia;

(b)    has agreed to adjudicate questions pertaining to the validity, construction, and effect, and administration of the 1994 License Agreement in this forum;

(c)    has transacted business in the District of Columbia with ISG and other persons and entities, including without limitation that the 1994 license agreement was accepted in this judicial District;

(d)    has contracted in the District of Columbia with ISG and other persons and entities; and

(e)    has constitutionally sufficient contacts with the District of Columbia to make personal jurisdiction proper in this Court.

## **VENUE**

9.    Venue is proper in this judicial District under 28 U.S.C. §§ 1391(b) and (c).

## **GENERAL ALLEGATIONS**

10.    ISG is engaged in the business of selling, procuring, and placing property, casualty and other insurance on a wholesale and retail basis.

11.    NACCB is a non-profit corporation that represents the interests of companies in the United States that are engaged in the information technology ("IT") services industry.

12.    On or about January 1, 1994, ISG and NACCB entered into a valid, binding, and enforceable License Agreement ("the 1994 License Agreement").  (A true and correct copy of the 1994 License Agreement is attached hereto as Exhibit A.)

13.     Under the 1994 License Agreement, NACCB granted ISG "an exclusive license to use the names "National Association of Computer Consultant Businesses" and "NACCB" ('Licensed Names')" in connection with ISG's marketing and sale of property and casualty insurance plans to Members and Potential Members of NAACB.

14.     Section five of the 1994 License Agreement, entitled "Payment," further provided in pertinent part that "[i]n sole consideration of the license herein granted by Licensor, Licensee will pay Licensor the amount specified in Addendum B of this Agreement." ISG has fully performed its obligations to NACCB under the 1994 License Agreement, including but not limited to the payments of all amounts specified in Addendum B to the 1994 License Agreement.

15.     Section ten of the 1994 License Agreement, entitled "Jurisdiction," further provided, in pertinent part, that "[t]his Agreement is accepted by the parties in the District of Columbia," and that "[a]ll questions pertaining to its validity, construction, effect and administration shall be brought only in a federal district court of Maryland or federal district court of the District of Columbia."

16.     On or about June 16, 2003, ISG and NACCB executed a royalty agreement, with an effective date of January 1, 2003 ("the 2003 Royalty Agreement"). (A true and correct copy of the 2003 Royalty Agreement is attached hereto as Exhibit B.) Under the 2003 Royalty Agreement, NACCB granted ISG a non-exclusive license to use "certain marks and other intangible personal property" of NACCB (including but not limited to the word "NAACB" and use of NAACB's logo) "in association with its solicitation of NACCB members and non-members to purchase" specified property and casualty insurance plans.

17.     Paragraph 17 of that agreement provided in pertinent part that the 2003 Royalty Agreement "supersedes all prior agreements between the parties including the parties' License

Agreement dated January 1, 1994 (the '**Prior Agreement'**), as of the first day of this Agreement's term.  However, each party shall retain any rights or entitlements accrued during the term of the Prior Agreement…which must be exercised by written notice to the other party no later than December 31, 2004."

18.     Paragraph 10(a)(ii) of the 2003 Royalty Agreement specified the means by which either contracting party could terminate that Agreement without cause.  On or about August 28, 2003, ISG properly invoked the procedure set forth in that paragraph to terminate the 2003 Royalty Agreement without cause, effective December 31, 2003.

19.     ISG has fully performed its obligations to NACCB under the 2003 Royalty Agreement.

20.     In 2004, NACCB, for the first time, asserted that ISG had breached the 1994 License Agreement by, among other things, allegedly underpaying the royalties it owed to NACCB under that Agreement.  NACCB further asserted that ISG had infringed the Licensed Names during the period of the 1994 License Agreement without authority to do so.

21.     By letter to ISG dated June 2, 2004, NACCB reiterated these assertions, and stated that "[i]f we do not hear from you within [the next ten days], we are prepared to fully enforce NACCB's contractual rights."  The parties subsequently entered into discussions to resolve the underlying disputes.

22.     By letter dated May 16, 2005, counsel for NAACB again asserted that ISG had breached its obligations under the 1994 License Agreement, and further asserted that the amount of ISG's allegedly unpaid royalties exceeds the sum of $75,000.  NACCB further asserted that ISG had fraudulently induced NACCB to agree to the "early termination" of that Agreement.  The letter

also stated that "[i]f ISG is interested in discussing settlement of the dispute with NAACB prior to NACCB's filing its complaint, please let us hear from you no later than May 25th."

23.    NACCB's letter of May 16, 2005, and the substance and tenor of the parties' prior discussions, have given ISG a reasonable and justifiable apprehension that NACCB will institute litigation against ISG for (among other things) ISG's alleged infringement (without authority) of the Licensed Names, for ISG's alleged breach of the 1994 License Agreement, and for ISG's alleged fraudulent inducement of NACCB to agree to the alleged "early termination" of the 1994 License Agreement.

24.    There is a substantial and continuing controversy between ISG and NACCB as to NACCB's right to threaten or maintain suit for infringement of the Licensed Names, as to whether ISG has fully performed its obligations to the NACCB under the 1994 License Agreement (including but not limited to the full payments of all royalties owed to NACCB under that Agreement), and as to whether ISG fraudulently induced NACCB to agree to the alleged "early termination" of the 1994 License Agreement. The issuance of declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## CLAIMS FOR DECLARATORY RELIEF

25.    ISG realleges Paragraphs 1 through 24 of this Complaint above as if fully set forth herein.

WHEREFORE, by reason of the foregoing, Plaintiff ISG International, Inc. respectfully seeks and is entitled to judicial declarations:

(a)    that ISG's use, if any, of the Licensed Names was with authority, and thus ISG has not impermissibly infringed any rights NACCB may have in the Licensed Names under the Federal Trademark Act; and

(b)    that ISG has fully performed its obligations to the NACCB under the 1994 License Agreement, including but not limited to the payment of all royalties owed to NACCB under that Agreement; and

(c)    that ISG did not fraudulently induce NACCB to agree to an "early termination" of the 1994 License Agreement; and

(d)    that ISG is entitled to all costs and disbursements incurred in connection with this action, including all attorneys fees, costs and expenses, to the extent allowed under law; and

(e)    that ISG is entitled to such other and further relief as this Court may deem just and proper.

ISG INTERNATIONAL, INC.,

By:

Ari S. Zymelman (Bar No. 42159)
John L. Cuddihy (Bar No. 472715)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (telephone)
(202) 434-5029 (facsimile)

Counsel for Plaintiff ISG International, Inc.

Dated:  May 24, 2005

0415:09/29/94
DDY16:1568M

## LICENSE AGREEMENT

THIS AGREEMENT ("Agreement"), made as of this 1st day of January, 1994, by and between G. Philip Feldman, Inc. t/a Insurance Services Group ("Licensee"), 204 Cedar Street, Cambridge, Maryland 21613 and National Association of Computer Consultant Businesses, Inc. ("Licensor"), 1250 Connecticut Avenue, N.W., Suite 700, Washington, D.C. 20036.

### BACKGROUND

Licensee is engaged in the business of selling, procuring, and placing property, casualty and other insurance on a wholesale and retail basis.

Licensor is a national association in the technical services industry ("Industry") representing its member companies ("Members") which use the services of both in-house administrative staff and outside technical consultants to provide services to their customers.

The services offered by these Members and similar companies whose names appear on Licensor's mailing list, but are not Members ("Potential Members") include locating and providing outside technical consultants for their customers who are in need of temporary technical support in areas that include computer sciences, engineering, statistics and similar technical fields.

Licensee has developed a property and casualty insurance program ("CCBSURE") which includes property insurance, liability insurance, errors and omissions insurance, commercial automobile insurance, director and officer liability insurance (collectively referred to as the "Plans"), see Addendum A, and desires to offer it to Members and Potential Members on an exclusive basis. Workers compensation insurance is specifically excluded from this Agreement.

Subject to the terms and conditions contained in this Agreement, Licensor grants Licensee an exclusive license to use the names "National Association of Computer Consultant Businesses" and "NACCB" ("Licensed Names"), but solely in connection with Licensee's marketing and sale of the Plans included in the CCBSURE program to Members and Potential Members.

EXHIBIT

A
_____

PENGAD 800-631-6989

0415:09/29/94
DDY16:1568M

Use of the Licensed Names by Licensee is intended as an entree or introduction to Members and Potential Members only and not as an endorsement by Licensor to its Members and Potential Members of CCBSURE or the Plans.

The parties wish to set forth in a formal agreement their respective rights, duties, and obligations.

NOW THEREFORE, the parties intending to be legally bound agree as follows:

I.   EFFECTIVE DATE.

The effective date of this Agreement is January 1, 1994, ("Effective Date") even though it may be executed on a date prior or subsequent thereto.

II.   DUTIES AND RESPONSIBILITIES OF LICENSOR.

The duties and responsibilities of Licensor shall be as follows:

1.   Licensor hereby grants Licensee an exclusive license to use the Licensed Names in connection with the marketing of CCBSURE and the Plans listed in Addendum A of this Agreement provided through CCBSURE for property and casualty insurance programs; provided, however, that Licensor will consider adding additional Plans to this Agreement at the request of Licensee. Licensor will have no involvement in Licensee's determination as to whether, and on what terms, to sell a particular Plan to a particular Member or Potential Member.

2.   Other than to announce the availability of the CCBSURE Plans to Members and Potential Members, Licensor agrees that it will not sponsor, endorse, solicit, sell, aid, or otherwise influence its Members or Potential Members in the procurement of any Plans provided through CCBSURE or any other insurance broker. Licensor, however, may request in writing that Licensee develop a reasonably obtainable property or casualty product to be offered within the CCBSURE program at certain rates and if Licensee is unable within 120 days to provide such a product at such rates, Licensor may enter into a similar Agreement with a third party capable of providing such a product at such rates.

3.   Other than to confirm the existence of a particular Plan on Addendum A, Licensor shall refer any communication, whether written, telephonic, or in person specifically regarding CCBSURE or its Plans, to Licensee and will not discuss, describe, or endorse any of the Plans included in CCBSURE with or to a Member or Potential Member.

- 2 -

0415:09/29/94
ODY16:1568M

    4.   Licensor represents that it is the owner of the Licensed Names and has the right to License the use thereof to Licensee as set forth in this Agreement.

III.   <u>DUTIES AND RESPONSIBILITIES OF LICENSEE</u>.

    The duties and responsibilities of Licensee shall be as follows:

    1.   Licensee will provide qualified senior staff and account executive services to assure the necessary liaison between Licensee, the insurance carriers, and any third-party administrators.

    2.   Licensee will develop marketing campaigns which contain the Licensed Names and best promote the CCBSURE program and its Plans to Members and Potential Members, in accordance with this Agreement and all applicable laws.  This includes, but is not limited to, the design, preparation, printing and dissemination of brochures and/or other marketing materials.  Licensor shall be given at least thirty (30) days' prior written notice and copies of material to be used in any marketing campaign and shall have the right to disapprove of marketing campaigns containing the Licensed Names, but only if such marketing campaigns do not comply with the terms of this Agreement or violate any applicable state, federal or local law.  To be effective, disapproval must be received in writing by Licensee at least fifteen (15) days prior to implementation of the marketing campaign.  All marketing campaigns will include the statement that Licensee is a distinct and separate entity from Licensor and not affiliated with, nor endorsed by, Licensor.

    3.   Licensee will administer the CCBSURE program including processing insurance applications, issuing certificates and policies which evidence insurance coverage, collecting premiums and remitting such premiums to the insurer in accordance with the insurer's instruction.  Licensee will provide quarterly reports to Licensor containing nonconfidential information (including the premiums paid by insureds) as may reasonably be requested by Licensor regarding the administration of the CCBSURE program to enable Licensor to assure compliance with the terms of this Agreement and all applicable laws.

    4.   Licensee will assist Members and Potential Members with the payment of claims by submitting claims to the carrier, following-up with the carrier to see that an adjuster has been assigned, and following-up on whether the carrier has sent out a proof of loss.

    5.   It is understood and agreed that all records pertaining to the CCBSURE program are the property of Licensee, but Licensor may have access in the Washington, D.C. metropolitan area to such nonconfidential information (including the premiums

- 3 -

0415:09/29/94
DDY16:1568M

paid by insureds) as is reasonable to assure compliance with the terms of this Agreement and all applicable laws.

6.   In the event Licensee determines that new insurance carriers or plans would enhance the CCBSURE program, Licensee will make such recommendations as may be appropriate to obtain Licensor authorization to use the license granted herein in connection with those new carriers or plans, which authorization shall be in writing.

7.   Licensee will use best efforts to prevent disclosure to any unauthorized persons of any information that may be contained in, or derived from, applications, claim forms or other administrative records held by Licensee and used in connection with the CCBSURE program and its Plans.

8.   Licensee will not knowingly solicit or engage in the sale of any products or services not contained in Addendum A to Members or Potential Members without the use of the Licensed Names.  Interest by Members and Potential Members in products and services not included in Addendum A will be disclosed to Licensor, when known by Licensee.

9.   Licensee represents that the premium rates paid by Members represent a significant savings (i.e., approximately $2,500 at a minimum) over the premium rates paid by Potential Members.

IV.   ASSIGNMENT, SUBCONTRACTING, CONTRACTING, LICENSING.

1.   In the event that Licensee desires to assign this Agreement or to transfer a majority of the ownership of Licensee, Licensee agrees to notify Licensor at least 45 days prior to such assignment or transfer of control, or, if such assignment or transfer will take place in less than 45 days then at least three (3) weeks prior to such assignment or transfer so that the proposed assignee or transferee may meet with representatives of Licensor in Washington, D.C. or such other location as is acceptable to Licensor.  This Agreement shall remain in effect subsequent to such assignment or transfer, except that in the period of 90 days to 120 days after such assignment or transfer Licensor may notify the assignee or transferee that it wishes to terminate this Agreement ("Initial Notification") because it is unsatisfied for any reason, which reason shall not be unreasonable, in which case assignee or transferee will have an additional 90 days to persuade Licensor not to terminate.  If Licensor determines not to terminate, this Agreement will continue in effect in accordance with the terms hereof; if Licensor determines to terminate, this Agreement will terminate 90 days after Licensor's Initial Notification and the provisions of Section VII, paragraph 4 and any other provisions relevant to post-termination matters shall apply as stated herein.

0415:09/29/94
DDY16:15G8M

    2.   Licensee may not subcontract its responsibilities under this Agreement.

    V.   PAYMENT.

    In sole consideration of the license herein granted by Licensor, Licensee will pay Licensor the amount specified in Addendum B of this Agreement.  Payment shall be made within sixty (60) days following the end of each calendar quarter (payments for the first three quarters of 1994 will be made by October 15, 1994).  Payments will be made only for accounts on Addendum A where the total premiums paid by an insured for all such accounts are in excess of $2,500; provided, however, that if the total premiums excluded hereunder exceed $25,000 in any calendar year, payments will be made on any insured's excluded accounts where the total premiums paid by that insured for all such accounts are in excess of $1,500 (i.e., premiums paid by an insured whose total premiums are less than $1,500 in a year will not be included in calculating payments to NACCB).

    VI.   INDEMNIFICATION.

    1.   Licensee shall at all times exercise a level of due care, prudence and diligence in carrying out its duties and responsibilities.

    2.   Licensee shall defend, indemnify and otherwise hold harmless Licensor and its members, officers, directors, members of its appropriate committee, employees and agents (hereinafter call Indemnified Persons) from and against any and all claims, suits, actions, causes of action, penalties, demands or judgments which may be imposed on, incurred by or instituted against any such Indemnified Persons as a result of any action, stemming from this Agreement, allegedly taken or not taken by Licensee or by any person acting under its authority or direction, in connection the performance or nonperformance of its duties and responsibilities under this Agreement.  Licensor shall give Licensee notice of such matter as soon as it has knowledge thereof.  However, Licensor, its agents, servants or employees shall be liable for any action resulting from its own negligence, willful misconduct or lack of good faith.

    3.   Licensor shall defend, indemnify and otherwise hold harmless Licensee from any and all claims, suits, actions, causes of action, penalties, demands or judgments which may be imposed on, incurred by or instituted against Licensee stemming from (a) Licensor's representation that it is the owner of the Licensed Names and has the right to license the use thereof, (b) acts by Licensor to sponsor, endorse, solicit, sell, aid or otherwise influence its Members or Potential Members in the procurement of any Plans provided through CCBSURE (other than to announce the availability of the CCBSURE Plans to Members and

– 5 –

0415:09/29/94
DDY16:1568M

Potential Members), or (c) acts by Licensor to discuss, describe
or endorse any of the Plans included in CCBSURE with or to a
Member or Potential Member in response to a communication, whether
written, telephonic or in person specifically regarding CCBSURE or
its Plans (other than to confirm the existence of a particular
Plan on <u>Addendum A</u>).  Licensee shall give Licensor notice of such
matters as soon as it has knowledge thereof.  However, Licensor's
indemnification shall not apply if, in regard to any of the acts
at issue, Licensee, its agents, servants or employees engaged in
negligence, willful misconduct or lack of good faith or
contributed to Licensor's actions.

VII.    <u>AMENDMENT AND TERMINATION</u>.

1.    This Agreement represents the entire agreement
between the parties and supersedes all previous agreements,
whether written or oral, between the parties; provided, however,
that this Agreement may be amended from time to time in writing by
mutual consent of the parties.

2.    This Agreement shall remain in force for an
initial period of three (3) years from the Effective Date and
thereafter shall be automatically renewed for subsequent two (2)
year periods unless otherwise terminated by Licensor or Licensee,
with such termination to be effective only upon the expiration of
the initial period or the expiration of any renewal period
thereafter, or for cause as set forth below.  In the event either
Licensor or Licensee wishes to terminate this Agreement without
cause, said party shall make its intent known in writing to the
other party at least 120 days prior to the end of the initial
three (3) year period or any of the two (2) year renewal periods.

3.    Upon the occurrence of any of the following
events, each of which shall be deemed a material default, Licensor
or Licensee as stated below, shall have the right to terminate
this Agreement after expiration of the stated cure period, and a
failure of the non-performing party to cure the default
immediately:

(a)    Licensor or Licensee may terminate if the
other party fails to comply with, observe, and/or perform any of
the terms and/or covenants of this Agreement but only if notice of
default is first given in writing and the default is not corrected
within fifteen (15) days of notification;

(b)    Licensor may terminate if Licensee fails
to make any payment within fifteen (15) days following the date
when such payment is due in accordance with the terms of this
Agreement;

(c)    Licensor may terminate if Licensee becomes
insolvent; or Licensee files a petition under any bankruptcy,
reorganization, insolvency, or moratorium law, or any law for the

0415:09/29/94
DDY16:1568M

relief of, or relating to, debtors; or any involuntary petition under any bankruptcy statute is filed against Licensee or any receiver or trustee is appointed to take possession of property of Licensee  Notwithstanding the above, Licensee will have 45 days after the filing of any such petition in bankruptcy to attempt to have the petition withdrawn or resolved before Licensor has the right to terminate this Agreement pursuant to this paragraph; or

(d)  Licensee may terminate this Agreement if the total monthly premiums do not average One Hundred Thousand Dollars ($100,000) per month at the end of 24 months or Two Hundred Thousand Dollars ($200,000) per month at the end of 36 months.

4.  In the event of termination of this Agreement for any reason:

(a)  Licensee shall immediately cease using all materials which make use of the Licensed Names; provided, however, that Licensee may continue to fulfill its obligations to Members and Potential Members who have been issued insurance policies during the term of this Agreement so long as the Licensed Names are no longer used.

(b)  The indemnification provided for in paragraph VI of this Agreement shall survive any termination of this Agreement.

(c)  Licensee shall make a termination payment to Licensor within sixty (60) days of such termination, equal to twice the total amount of such payments made to Licensor within the six-month period prior to such termination.

VIII.   CHANGE IN TAX TREATMENT.

The parties acknowledge that their intent is that payments paid to Licensor under this Agreement are treated by the Internal Revenue Service (the "IRS") as excludable from the computation of unrelated business taxable income.  If this tax treatment of income to Licensor is not possible, either because of amendment of the Code or reinterpretation of existing law by the IRS, the parties agree to take steps promptly to modify this Agreement as necessary to maintain the treatment of such payments to Licensor as non-taxable income, or if maintaining such tax treatment is impossible, to secure the most favorable tax treatment of such payment as possible.  Any such modification of this Agreement must comply with all applicable insurance laws and regulations and must not be detrimental to the interests of Licensee.

IX.   RELATIONSHIP OF PARTIES.

The parties are Licensor and Licensee.  The parties do not intend this Agreement to create and this Agreement is not

0415:09/29/94
DDY16:1568M

to be construed as creating a partnership, joint venture, master-servant, principal-agent, or any other relationship. Except as provided in Paragraph VI of this Agreement, neither party may be held liable for acts of omission or commission of the other party, and neither party is authorized to or has the power to obligate or bind the other party by contract, agreement, warranty, representation, or otherwise in any manner whatsoever except as may be expressly provided herein.

     X.   JURISDICTION.

     This Agreement is accepted by the parties in the District of Columbia. All questions pertaining to its validity, construction, effect and administration shall be brought only in a federal district court of Maryland or federal district court of the District of Columbia and should be determined and governed in accordance with the applicable laws of the State of Maryland.

     XI.   INTENT TO CONTRACT.

     This Agreement shall be binding not only upon the parties hereto, but also upon their successors or assigns and the parties hereto agree for themselves and their successors or assigns, to execute any instrument and to perform any acts which may be necessary or proper to carry out the purpose of this Agreement.

     XII.   WAIVER.

     1.   The waiver of a breach of any of the terms hereof or any default hereunder, shall not be deemed a waiver of any subsequent breach or default, whether of the same or similar nature, and shall not in any way affect the other terms thereof.

     2.   Modifications hereto shall be valid and binding only if executed writing and signed by the parties hereto.

     XIII.   TITLES AND HEADINGS.

     The titles and headings of this Agreement are inserted for convenience and identification and shall not be relied upon in connection with the construction or interpretation of this Agreement.

     XIV.   SEVERABILITY.

     In the event any parts of this Agreement are found to be void, the remaining provisions of the Agreement shall nevertheless be binding with the same effect.

0415:09/29/94
DDY16:1568M

XV.   CHANGE OF NAME.

In the event of a change of name of Licensor or Licensee, all parts of this Agreement will apply to the new name of the organization exactly as they did to the old.

XVI.   NOTICES.

All notices and other communications relating to this Agreement shall be in writing and shall be sufficiently given if delivered to the addressee in person or if mailing, certified mail, return receipt requested, addressed as set forth below:

(a)   If to Licensor:

National Association of Computer
Consultant Businesses, Inc.
1250 Connecticut Avenue, N.W., Suite 700
Washington, D.C.  20036

Attention:  Harvey J. Shulman, General Counsel

(b)   If to Licensee:

Insurance Services Group, Inc.
204 Cedar Street
Cambridge, Maryland  21613

Attention:  G. Philip Feldman

XVII.   INTEGRATION.

This Agreement expresses the entire understanding of the parties to it and replaces any and all former agreements, understandings, or representations relating in any way to the subject matter thereof.

XVIII.   COUNTERPARTS.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

XIX.   WORD FORMS.

Whenever used herein, the singular includes the plural and the plural includes the singular.  The use of any gender, tense or conjugation includes all genders, tenses and conjugations.

Either addressee may alter the address to which communications are to be sent by giving notice of such change of address in conformity with the provision of this paragraph.

0415:09/29/94
DDY16:1568M

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth on page 1 of the Agreement.

National Association of Computer Consultant Businesses, Inc.

By _____

Title _____

Insurance Services Group, Inc.

By _____

Title _____

0415:09/29/94
DDY16:1568M

## ADDENDUM A

1. Property Insurance

2. Liability Insurance

3. Errors and Omissions Insurance

4. Commercial Automobile Insurance

5. Director and Officer Liability Insurance

0415:09/29/94
DDY16:1568M

## ADDENDUM B

2% up to $2,500,000

2.25% excess of $2,500,000

2.5% excess of $3,000,000

2.75% excess of $3,500,000

3% excess of $4,000,000

## ROYALTY AGREEMENT

**THIS ROYALTY AGREEMENT** ("Agreement") is entered into as of the 1st day of January, 2003 between the NATIONAL ASSOCIATION OF COMPUTER CONSULTANT BUSINESSES, a non-profit corporation which is exempt under Section 501(c)(6) of the Internal Revenue Code, as amended ("NACCB"), and ISG International, Inc., a for profit corporation ("Licensee").

WITNESSETH

WHEREAS, NACCB is an association of companies engaged in the IT services industry;

WHEREAS, Licensee markets insurance products to companies within the IT services industry;

WHEREAS, Licensee desires to make available the Products and Services (hereinafter, the **"Products and Services"** which is defined in Exhibit A) to IT services companies upon the terms and conditions hereinafter set forth; and

WHEREAS, Licensee desires to license from NACCB the use of certain marks and other intangible personal property (the **"Marks"**) and NACCB's membership list, more specifically described in Exhibit B, attached hereto and incorporated herein by reference, for the purpose of soliciting IT services companies to utilize the Products and Services.

**NOW, THEREFORE,** it is agreed by the parties hereto as follows:

1. <u>License of Marks.</u>

(a) NACCB hereby grants to Licensee for the term of this Agreement a non-exclusive license to use the Marks, in association with its solicitation of NACCB members and non-members to purchase the Products and Services. During the term of this Agreement, NACCB shall have no other royalty agreement in effect with a company other than Licensee for the use of its Marks in connection with the sale of the Products and Services as defined in Exhibit A.

(b) During the term of this Agreement, NACCB agrees to provide a statement describing the Endorsement of Licensee, as the preferred provider of the Products and Services to NACCB members in Licensee's promotional materials (the **"Endorsement"**). Notwithstanding the foregoing, nothing in this Agreement shall limit NACCB's ability to allow any other provider of Products and Services from advertising in NACCB publications or exhibiting or sponsoring at NACCB conferences, tradeshows or other NACCB events; however, NACCB shall not during the term of this Agreement, intentionally and directly solicit advertising, exhibiting or sponsorship of the Products and Services by other providers.

(c) In addition to the other rights granted Licensee under this Agreement, NACCB shall provide Licensee during the term of this Agreement with one $3,000 credit on an annual basis, towards the

PENGAD 800-631-6989

EXHIBIT

B

sponsorship fee of a sponsorship opportunity at the NACCB Annual Conference.  Licensee shall be responsible for any design, production or other costs associated with the particular sponsorship opportunity.

2.      Membership List. NACCB agrees to provide to Licensee a list of its members (the "**Membership List**").  NACCB shall deliver to Licensee an updated Membership List from time to time.  Licensee may use the Membership List solely in connection with the marketing of the Products and Services.

3.      Term.  This Agreement shall commence on January 1, 2003 and shall continue for a term of one (1) year, which will automatically renew for successive one-year periods, unless otherwise terminated in accordance with Section 10.

4.      Compensation.

(a)      As compensation for the Endorsement, the license to use the Marks and use of the Membership List, Licensee shall pay NACCB an annual royalty (the "**Royalty**") during the term of the Agreement in the amount of $100,000 or in such other amount as the parties may mutually agree in subsequent years by a written addendum to this Agreement.  The royalty payments shall be made in four equal quarterly installments of $25,000 each quarter (or such other amount as the parties may mutually agree in a written addendum to this Agreement) and shall be made on March 31st; June 30th; September 30th; and December 31st.  In subsequent years, the parties shall negotiate the amount of that year's annual royalty payment between January 1st and February 28th.  Any modification to the amount of the annual royalty payment, which must be mutually agreed upon by the parties by a written addendum, shall be effective retroactive to January 1st of that year.  In the event the parties have failed to come to agreement on the royalty amount for a new year by February 28th and one of the parties has provided the other party by February 28th with written notice of intent to terminate this Agreement with termination effective as of April 30th of the same year (as provided under Section 10(a)(ii)(B) below), Licensee shall make prorated royalty payments as follows: a quarterly payment payable on March 31st in the amount equal to a single quarterly payment due during the prior year (e.g. if the quarterly payments due were $25,000 in 2003 and there is an effective notice to terminate given on or before February 28, 2004, the payment for the first quarter of 2004 shall be $25,000 payable on March 31, 2004) and a second royalty payment payable on April 30th in the amount of 1/12 of the amount of the total annual royalty payment due the prior year (e.g. if the annual royalty payment due was $100,000 in 2003 and there is an effective notice to terminate given on or before February 28, 2004, the payment for April 2004 shall be $8,333.33 which shall be payable on April 30, 2004). All payments under this Agreement shall be sent to NACCB (i) at the address set forth herein for the receipt of notices, or (ii) at such other address or into such bank accounts as NACCB may from time to time designate in writing to Licensee.  Interest shall accrue on any payments not paid when due at rate of one percent (1%) per month from the date prescribed for payment

(b)      NACCB may not intentionally represent to any current or prospective client of Licensee a specific dollar discount, but may reference Licensee's Products and Services represent "savings of up to _ % subject to underwriting criteria" or similar language.  Further, NACCB may point out to any current or prospective client of Licensee that the company's status as an NACCB member is a favorable consideration in the underwriting process if the NACCB member fits the profile of a typical NACCB member and may result in a premium savings. Upon the withdrawal of any client of Licensee from NACCB membership, Licensee shall reflect the change of status in all appropriate records and report to any underwriters or other appropriate personnel at a current or prospective insurer the change of membership status.  Licensee shall notify its client of this action.  Further, Licensee shall in its communications with current or prospective clients communicate the favorable consideration NACCB membership has in the underwriting process if the NACCB member fits the profile of a typical NACCB member which may result in a premium savings.  Licensee shall under no circumstances represent to anyone that an IT services firm's NACCB membership status is irrelevant in determining that firm's insurance premium or convey similar sentiments.

2

5.     <u>Quality Control</u>. All use of NACCB's name, as well as all mailings to NACCB members by either party to this Agreement, shall include all appropriate legal notices as required herein. Licensee agrees that it will not use or permit to be used NACCB's Marks without such NACCB's prior written consent in each and every instance. Licensee agrees to provide NACCB, without limitation, a reasonable opportunity to review all materials sent to NACCB members containing NACCB Marks or referencing its Endorsement. NACCB may immediately terminate the license to use of its Marks and access the NACCB membership list if NACCB reasonably determines that the quality of the Products and Services is such that the use by Licensee of the Marks would materially damage NACCB's reputation.

6.     <u>Expenses</u>. Licensee shall be responsible for the development and dissemination of promotional and solicitation materials, subject to the prior approval by NACCB of all such materials if they bear NACCB Marks or reference its Endorsement. The cost of producing and distributing such materials and programs shall be borne exclusively by Licensee and NACCB shall not be liable for any costs related thereto. Licensee shall be responsible for all expenses associated with providing Products and Services to clients.

7.     <u>Indemnification</u>. Licensee agrees to defend and indemnify NACCB and its officers, directors, agents and employees (an "Indemnitee") against all costs, claims, damages, expenses and losses (including reasonable attorneys' fees and costs whether or not a lawsuit is instituted) incurred by an Indemnitee and arising from or related to, directly or indirectly, the activities of Licensee, its agents, employees, and affiliated insurers.

NACCB agrees to defend and indemnify Licensee and its officers, directors, agents and employees (an "Indemnitee") against all costs, claims, damages, expenses and losses (including reasonable attorneys' fees and costs whether or not a lawsuit is instituted) incurred by an Indemnitee and arising from or related to, directly or indirectly, the activities of NACCB, its agents and employees.

8.     <u>Relationship of the Parties</u>. Nothing in this Agreement shall be construed as constituting a partnership, joint venture, agency or other relationship between the parties hereto.

9.     <u>Confidentiality</u>. The parties agree to keep the other party's confidential information including keeping, but not limited to all data, documents and information pertaining to NACCB members, including, without limitation the Membership List (excluding existing clients of Licensee who are also NACCB members), ("**Confidential Information**") and in the event of the termination of this Agreement the receiving party will return to the other party all Confidential Information. The parties agree that any and all Confidential Information provided to the other party shall be the sole property of disclosing party and shall not be used, transferred, reproduced or otherwise dealt with by the receiving party, its agents or employees except under terms and conditions approved by the disclosing party.

10.     <u>Termination</u>.

(a) This Agreement may be terminated by NACCB or Licensee under the following exclusive conditions:

(i)     with cause, by NACCB or Licensee in the event of a material default (as more particularly defined in (A) and (B) below) by the non-performing party, where the default is not cured within the stated cure period:

(A)     if the other party fails to perform any of its material obligations under this Agreement (e.g., if Licensee fails to make a payment due) and the default is not cured within fifteen (15) days of written notice of the default; or

(B)     if the other party shall be adjudicated a bankrupt or shall petition for any relief under any bankruptcy, reorganization, receivership, or similar insolvency statute whether now or hereinafter in effect, or shall make an assignment for the benefit of its creditors, or shall petition for the

3

appointment of a receiver, liquidator, trustee or custodian for all or a substantial part of its assets, or if a receiver, liquidator, trustee or custodian is appointed for all or a substantial part of either such party's assets and is not discharged within forty-five (45) days after the date of such appointment.

or

(ii)     without cause,

(A) by either party, if the terminating party has given the other party written notice no later than September 1st of intent to terminate this Agreement, which termination shall be effective as of December 31st of the same year; or (B) by either party, if the parties have failed to come to agreement on the royalty amount for a new year by February 28th and one of the parties has provided the other party by February 28th with written notice of intent to terminate this Agreement, which termination shall be effective as of April 30th of the same year. Absent a timely notice of intent to terminate or termination on other grounds specifically authorized under this Section 10, this Agreement shall renew for successive one-year periods.

(b) In the event of termination of this Agreement for any reason:

(i)     Licensee shall cause its agents and employees to cease using the Marks and the Membership List, cease using any other materials provided to each other under this Agreement, and cease referring to the Endorsement in any communications or written materials as of the effective date of termination, and shall immediately return all Confidential Information to NACCB;

(ii)     Licensee shall make a termination payment in the amount of $100,000 to NACCB within sixty (60) days of termination; and

(iii)     Except as provided in this Paragraph 10 (e.g. the termination payment) and Paragraph 11, neither party shall have any further obligations or liabilities to the other under this Agreement as of the effective date of the termination.

11.     <u>Obligations Surviving Termination</u>.  Notwithstanding any termination of the license granted to Licensee under this Agreement and any exercise by either party of any rights and remedies hereunder, the following rights and obligations shall survive after any such termination or exercise of rights to the degree necessary to permit their fulfillment or discharge:

(a)     NACCB's right to receive and Licensee's obligation to pay, the amount of all Royalties payable through the effective date of termination of this Agreement along with other sums payable under this Agreement (e.g. termination payment).

(b)     Any rights or remedies of NACCB or Licensee under Section 7 of this Agreement and any cause of action or claim of NACCB or Licensee, whether or not accrued at the time of termination, because of the other party's breach of or failure to perform any of that party's obligations under this Agreement.

12.     <u>Notices</u>.  Except as otherwise set forth herein, any agreement, approval, consent, notice, request or other communication required or permitted to be given by either party to the other under this Agreement shall be in writing and shall be deemed to have been given (i) when delivered by hand or by courier, (ii) when five (5) days

4

have elapsed after its transmittal by mail, postage prepaid, return receipt requested, or (iii) when transmitted by facsimile (with a copy simultaneously sent by mail, postage prepaid, return receipt requested) to the address set forth below:

**If to NACCB, to it at:**
1800 Diagonal Road, Suite 520
Alexandria, VA 22314
Attn: Mark Roberts
Tel: (703) 838-2050
Fax: (703) 838-3610


**If to Licensee, to it at:**
ISG International, Inc.
204 Cedar Street, P.O. Box 716
Cambridge, MD 21613
Attn: Steve Robinson
Tel: (410) 901-0704
Fax: (410) 901-0804


13.     <u>Governing Law; Venue</u>.  This Agreement shall be governed by the laws of the Commonwealth of Virginia, without regard to choice of law principles, and any litigation shall be brought in the state or federal courts of Alexandria, Virginia.  The parties agree to the exercise of personal jurisdiction over them by such courts to the fullest extent permitted by law.

14.     <u>Binding Agreement</u>.  The provisions of this Agreement shall be binding on and shall inure to the benefit of the parties hereto and there respective successors and assigns.  The waiver by either party of any provision of this Agreement shall not constitute a waiver of that party's right to enforce such provision or any other provision of this Agreement.

15.     <u>Assignability</u>.  The licenses granted hereunder are personal to the Licensee and shall not be assigned by any act of the Licensee or by operation of law except by prior written consent by NACCB.

16.     <u>Severability</u>.  If any provision of this Agreement, or the application of the provision to any person or circumstance, is held to be inconsistent with any present or future law, ruling, rule or regulation of any court or governmental or regulatory authority having jurisdiction over the subject matter of this Agreement, such provision shall be deemed to be modified to the minimum extent necessary to comply with such law, ruling, rule or regulation, and the remainder of this Agreement, or the application of such provision to persons or circumstances other than those as to which it is held inconsistent, shall not be affected.  If any provision is determined to be illegal, unenforceable or void, and if the remainder of this Agreement shall not be affected by such determination and is capable of substantial performance, then such void provision shall be deemed rescinded and each provision not so affected shall be enforced to the extent permitted by law.

17.     <u>Entire Agreement; Superseding Prior Agreement; Amendments</u>.  This Agreement constitutes the entire understanding of the parties with respect to the matters herein and supersedes all prior agreements between the parties including, the parties' License Agreement dated January 1, 1994 (the **"Prior Agreement"**), as of the first day of this Agreement's term.  However, each party shall retain any rights or entitlements accrued during the term of the Prior Agreement (e.g. monies owed but not yet paid as of the effective date of this Agreement) which must be exercised by written notice to the other party no later than December 31, 2004.  Nothing in this Agreement shall constitute a waiver of said rights or entitlements until December 31, 2004. This Agreement may not be modified or amended, except in writing, signed by authorized representatives of NACCB and Licensee.

18.     <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same instrument.

19.    <u>Headings</u>.  The headings in this Agreement are for reference purposes only, do not constitute a part of this Agreement and shall not affect its meaning or interpretation.

**IN WITNESS WHEREOF**, the parties have executed this Royalty Agreement effective as of the day and year first written above.

**National Association of Computer Consultant Businesses, a not-for-profit corporation**

By: _____

    Name: _____

    Title: _____

**LICENSEE:**    ISG International, Inc., a for-profit corporation

By: _____

    Name: *STEVEN R. ROBINSON* _____

    Title: *CHIEF OPERATING OFFICER* _____

<u>EXHIBIT A</u>

As used herein, "Products and Services" shall mean the following lines of insurance coverage:

Commercial Automobile (CAUT)
Directors & Officers Liability (D&OL)
Employment Practices Liability (EMPL)
Errors or Omissions (ERRS)
Excess Liability (EXLI)
Multi Peril (MULTI)
Umbrella (UMBC)

## EXHIBIT B

Rights Granted to Licensee

1.      Use of the word "NACCB".

2.      Use of NACCB's logo.

3.      The Endorsement of NACCB of Licensee as a preferred provider of the Products and Services, including statements to be used in Licensee's promotional materials.

4.      Use of NACCB's Membership List, which shall include the name, mailing address and telephone number of each member.